**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**


**CHARLOTTE BRANNON,**

　　　　**Plaintiff,**

**vs.**　　　　　　　　　　　　　　**Case No.　1:11-CV-273-CAS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

　　　　**Defendant.**

_____/


## <u>MEMORANDUM OPINION AND ORDER</u>

　　　　This is a Social Security case referred to the undersigned United States

Magistrate Judge upon consent of the parties and reference by Chief District Judge

M. Casey Rodgers.  Doc. 7.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful

consideration of the entire Record, the Court reverses the decision of the Commissioner

and remands the case for further consideration.

## I.  Procedural History of the Case

　　　　This case has a lengthy procedural history and the following chronology contains

the material facts.

　　　　On May 25, 1997, Plaintiff, Charlotte Brannon, filed a Title II application for a

period of disability and Disability Insurance Benefits (DIB) alleging disability beginning

April 1, 1997.  R. 572.  (Citations to the Record shall be by the symbol "R." followed by a

page number that appears in the upper right corner.)  Plaintiff's date last insured, or the

date by which her disability must have commenced in order to receive benefits (DIB) under Title II, is June 30, 1998.  *Id.* at 573.

Plaintiff's DIB application was denied initially and on reconsideration.  *Id.* at 572; Doc 15 at 2 and Doc. 21 at 1.  On April 15, 1999, following an administrative hearing, Administrative Law Judge (ALJ) Tony L. Eberwein entered a decision unfavorable to Plaintiff.  *Id.* at 572.  (The decision and the transcript of the hearing are not available.  Doc. 21 at 1 n.3.)  Plaintiff sought review before the Appeals Council and on June 6, 2002, the Council granted Plaintiff's request for review and remanded her case to the ALJ for additional proceedings.  R. 43, 325-28, 572.

ALJ Eberwein held a second hearing on December 19, 2002, and on July 17, 2003, entered a decision finding Plaintiff was not disabled.  *Id.* at 16-27.  ALJ Eberwein concluded that Plaintiff "retained the residual functional capacity [RFC] to do a limited range of light exertional work activities (CR pp. 16-27).  Based on the evidence of record and the testimony of a vocational expert, [ALJ Eberwein] denied the claim using the framework of medical-vocational rule 202.20."  *Id.* at 16, 24-27, 572.  On or about August 1, 2003, Plaintiff disagreed with the denial and requested the Appeals Council to review this decision.  *Id.* at 8-12, 572.  On May 18, 2004, the Appeals Council denied Plaintiff's request.  *Id.*

On July 15, 2004, Plaintiff filed a Complaint in the United States District Court, Middle District of Florida seeking review of ALJ Eberwein's July 17, 2003, decision.  *Id.* at 572.  On November 30, 2005, United States Magistrate Judge Elizabeth A. Jenkins entered a Final Order stating, as described by the ALJ on remand,

> that further fact finding was necessary due to errors of law at the administrative level, but [Judge Jenkins] did not express a view as to what the outcome of the

proceedings should be. Citing <u>Boyd v. Heckler</u>, 704 F.2d 1207, 1211 (11th Cir. 1983), Judge Jenkins pointed out that it was an error of law to discount a treating physician's opinion even though he did not treat the claimant until after the relevant determination date. Dr. McCarthy had rendered his opinion on October 6, 1998, less than four months after the claimant's insured status had expired [June 30, 1998]. In addition, Judge Jenkins noted an apparent discrepancy in the Administrative Law Judge's finding that that lupus had not "significantly affected the claimant's capacity work" (CR 22), but the Administrative Law Judge nevertheless indicated that lupus was a severe impairment (CR 18 and Exhibit 7B).

R. 572; *see id.* at 600. On this point, Judge Jenkins concluded: "Because the ALJ relied on an erroneous legal principle in discounting Dr. McCarthy's opinion, a remand is required for the Commissioner to evaluate the opinions of Dr. McCarthy under the proper standard." *Id.* at 600. Regarding a second point, Judge Jenkins found, however, that "*the ALJ properly considered the combined effect of Plaintiff's impairments*" and determined that Plaintiff "*second argument is without merit.*" *Id.* at 602 (emphasis added). The case was remanded to the Commissioner for further proceedings consistent with the Final Order. *Id.* at 594, 602.[2]

Judge Jenkins was referring to Dr. McCarthy opinion on October 6, 1998. *Id.* at 600. It is clear, however, that Dr. McCarthy treated Plaintiff beginning on June10, 1997, and continued until on or about August 29, 2003. *Id.* at 578.

On February 17, 2006, the Appeals Council remanded the case for a new hearing. *Id.* at 604-07. In its order, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ "for further proceedings consistent

---

[2] Plaintiff states in her Memorandum that Judge Jenkins remanded the matter for consideration of the first *and second issue,* i.e., "to properly consider the combined effect of all of Plaintiff BRANNON'S impairments and symptoms, both severe and non-severe, as required by *Hudson v. Heckler*, 755 F.2d 781, 785 (11th Cir. 1985) and other cases. Document 10-3, pages 594-603)." Doc. 15 at 2-3. Plaintiff is mistaken. *See id.* at 1027 (Plaintiff's former counsel describing the single issue that was remanded for consideration).

with the order of the court." *Id.* at 606. The Appeals Council further noted: "The

claimant filed a subsequent claim for a period of disability, disability insurance benefits

on November 10, 2004 and a new claim for supplemental security income benefits on

October 28, 2004. On remand, The [ALJ] will consider whether the subsequent and

new claims should be consolidated with the current claim." *Id.* The Appeals Council

also required the ALJ to "offer the claimant the opportunity for a hearing, take any

further action needed to complete the administrative record and issue a new decision."

*Id.* at 607.

On July 21, 2006, ALJ Holder held a hearing on remand. *Id.* at 1172A. In his

August 28, 2006, "Decision Following Court Remand," ALJ Holder stated that Plaintiff

"filed subsequent Supplemental Security Income disability claims on July 29, 2003,

March 1, 2004, and October 28, 2004, alleging disability beginning April 1, 1997. These

claims are considered duplicate claims and have been associated with the record as a

whole." *Id.* at 573. ALJ Holder also framed the issues as follows:

> The general issue is whether the claimant is entitled to a period of disability and
> [DIB] under sections 216(i), 223, and 1614(a)(3)(A) of the Social Security Act.
>
> An additional issue pertains to the claimant's disability claim under Title II of the
> Social Security Act which requires a claimant to meet the insured status
> requirements of the Act. The evidence establishes that she last met the insured
> status requirements of the Act on June 30, 1998. Thus, she must establish
> disability on or before that date in order to receive disability insurance benefits.

*Id.* at 573. After discussing the medical and other record evidence, ALJ Holder made

twelve separate "Findings" as follows:

> 1. The claimant met the disability insured status requirements of the Act on April
> 1, 1997, but she continued to meet them only through June 30, 1998.
>
> 2. The claimant has not engaged in substantial gainful work activity since April 1,
> 1997.

3.  The medical evidence establishes that the claimant has the following severe impairments: a chronic pain syndrome secondary to osteoarthritis, osteoporosis, systemic lupus erythematosus, possible fibromyalgia, and depression. She is status-post surgical repair of enterocele and cystorectocele causing stress urinary incontinence, chronic obstructive pulmonary disease secondary to a history of tobacco abuse, depression, and hypercholesterolemia; but she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix I to Subpart P of Regulations No.4.

4.  The claimant's testimony is not fully credible as her allegations of marked limitations are not well supported by the medical evidence of record beginning with her alleged disability onset date of April 1, 1997.

5.  The claimant's impairments have reduced her residual functional capacity to no more than sedentary exertional work activities.

6.  The claimant can no longer be expected to perform her past relevant work as a cafeteria worker or a corrections officer as her past relevant jobs required greater than sedentary exertional work activities.

7.  Born on November 18, 1951, the claimant was 42 years old beginning April 1, 1997, considered a younger individual.  She attained age 50 in November 2001, and she is currently 54 years of age.

8.  The claimant has a high school education.

9.  Considering the claimant's age at less than 50, her education, and her residual functional capacity for sedentary exertional work activities, medical-vocational rules 201.27, 201.28, and 201.29 would direct a conclusion of "not disabled."

10.  Beginning November 18, 2001, the claimant attained age 50.  Considering her age, education, and her residual functional capacity for sedentary exertional work activities, medical-vocational rules 201.12 and 201.14 direct a conclusion of "disabled."

11.  The claimant is no longer insured for disability insurance benefits under Title II of the Act as her insured status for those benefits expired on June 30, 1998.

12.  The claimant is eligible for disability payments under Supplemental Security Income beginning November 19, 2001, but not before (20 CFR 303.1520(g)).

*Id.* at 583-84.  Immediately prior to reciting the foregoing "Findings," ALJ Holder makes

the following findings that relate to the above enumerated findings:

Born November 18, 1951, the claimant was 41 years of age, considered a younger individual, as of her date of application on April 28, 1997. She is currently 54 years of age, considered "closely approaching advanced age." Considering her age, her high school education, and her reduced residual functional capacity limited to sedentary exertional work activities, the Medical-Vocational Rules 201.21 and 201.22 direct a finding of "not disabled."

However, considering a later onset date of disability beginning with attainment of age 50 on November 19, 2001, Medical-Vocational Rules 201.12 and 201.14 support a conclusion of "disabled." Consequently, the claimant may be found disabled beginning November 19, 2001, but not before that date. As her date last insured for Title II benefits expired on June 30, 1998, she is not entitled to disability benefits [DIB] under Title II of the Social Security Act.

Accordingly, the claimant has been found eligible for disability payments under Title XVI of the Social Security Act [SSI] beginning November 19, 2001, but her claim for disability payments under Title II of the Act is denied due to lack of insured status for those benefits.

*Id.* at 583. ALJ Holder's ultimate decision states:

It is the decision of the [ALJ] that, based on the application protectively filed on May 25, 1997, the claimant is *not entitled* to a period of disability or disability insurance benefits under Title II of the Social Security Act as her insured status coverage for those benefits expired on June 30, 1998.

It is the further decision of the [ALJ] that, based on the application protectively filed on May 25, 1997, the claimant *was under a disability* under 1614(a)(3)(A) of the Social Security Act beginning with November 19, 2001, but not before.

*Id.* at 584 (emphasis added). As a result, ALJ Holder's decision was partially favorable

to Plaintiff--Plaintiff received SSI benefits effective November 19, 2001, but not before,

including DIB. *Id.*

On September 11, 2006, Plaintiff sought review before the Appeals Council and

submitted a lengthy brief and statement of exceptions. *Id.* at 1027-33. On September

18, 2007, counsel submitted a second letter asking the Appeals Council to expedite the

September 2006 request for review. *Id.* at 1034-35. On September 16, 2008, the

Appeals Council remanded the case for additional proceedings because the file and

hearing tape could not be located. *Id.* at 1055-59, 1160.

On July 13, 2010, ALJ Philemina M. Jones held an additional hearing, but Plaintiff and her counsel did not appear. *Id.* at 1207. On July 29, 2010, ALJ Jones entered an order dismissing the case. *Id.* at 1158-59. On September 22, 2010, Plaintiff retained current counsel and requested review of the dismissal. *Id.* at 1160, 1165. On October 17, 2011, the Appeals Council was now in receipt of the claim file and the 2006 hearing tape. *Id.* at 1160. The Appeals Council vacated the dismissal and in the same notice advised Plaintiff that her request to review ALJ Holder's decision dated August 28, 2006, was now before the Appeals Council. *Id.* In the same letter, the Appeals Council considered "the additional information [and found] no reason under [their] rules to review [ALJ Holder's] decision" and denied Plaintiff's request for review. *Id.* As a result, ALJ Holder's August 28, 2006, partially favorable decision is the final decision of the Commissioner of Social Security. *Id.* at 572.

On December 20, 2011, Plaintiff filed a complaint with the United States District Court seeking review of the ALJ Holder's August 2006 decision. Doc. 1. The parties filed memoranda of law, docs. 15 and 21, and those have been considered. Plaintiff requests review of the ALJ's decision and specifically requests disability benefits from April 1, 1997, or an earlier date, to November 18, 2001, the day before the day on which Plaintiff was found disabled and entitled to benefits, R. 584. Doc. 15 at 4.

Plaintiff raises two issues for consideration: 1) whether the ALJ properly considered the medical source opinions (treating physician opinions) during the relevant time period when assessing Plaintiff's residual functional capacity (RFC); and

2) whether the ALJ erred in not giving great weight to the Florida Division of Vocational Rehabilitation's 1995 decision that Plaintiff could not be vocationally rehabilitated.  Doc. 15 at 4-13, 13-15.

## II.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant

---

[1]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status. *See* 42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986). 42 U.S.C. § 423(d)(1)(A)

> quite clearly requires that it is the impairment only which must last for a continuous period. Normally, of course, when a claimant has an impairment severe enough to prevent him from working, he will be unable to work for as long as the impairment lasts. This is particularly true when the impairment is physical. The statute, however, does not *require* that a claimant be unable to engage in work during the entire 12 month period. *See also* 20 C.F.R. §§ 404.1505(a); 404.1509; 404.1510. The ability of a claimant to engage in work for limited periods of time certainly calls into question the severity of the impairment, but it does not necessarily determine whether the impairment, however, severe, has lasted for at least 12 months.

> While a claimant need only show that an alleged impairment has lasted or can be expected to last for the 12 month period to meet the duration requirement, a

claimant alleging a mental impairment may face a difficulty not presented in cases involving physical impairment. As one court has stated,

> While the mere existence of symptom-free periods may negate a finding of disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of the claim. Unlike a physical impairment, it is extremely difficult to predict the course of mental illness. Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.

*Lebus v. Harris*, 526 F.Supp. 56, 61 (N.D. Cal. 1981).

Because of such considerations, the courts which have considered the question have concluded that a claimant whose claim is based on a mental condition does not have to show a 12 month period of impairment unmarred by any symptom-free interval. . . . We agree with the assessment of these courts. A finding that a claimant has a mental impairment which manifests itself from time to time over a long-term period is not inconsistent with the language of the statute, which requires that an impairment last "for a continuous period of 12 months.". . . Of course, as required by the regulations, the claimant must present medical evidence which indicates that his mental condition is a long-term problem and not just a temporary setback. . . .

Singletary v. Bowen, 798 F.2d 818, 821-22 (5th Cir. 1986) (citations omitted). *See also*

Lane v. Astrue, No. 1:09CV00159-MP-AK, 2010 U.S. Dist. LEXIS 75846, at *28-30

(N.D. Fla. July 28, 2010) (citing Singletary).

The Commissioner analyzes a claim in five steps. 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have any impairments which prevent past relevant work?

5.   Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone

or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)). The opinion of a non-examining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician, whose opinion generally carries greater weight. *See* 20 C.F.R.

§§ 404.1527(d)(1); 416.927(d)(1); <u>Broughton v. Heckler</u>, 776 F.2d 960, 962 (11th Cir.

1985). A brief and conclusory statement that is not supported by medical evidence,

even if made by a treating physician, is not persuasive evidence of disability. <u>Johns v.

Bowen</u>, 821 F. 2d 551, 555 (11th Cir. 1987).

## III. Legal Analysis

### A. The ALJ's Consideration of the Treating Physician Opinions

### 1. Introduction

Plaintiff requests this case be remanded to the Commissioner with instructions

that he find Plaintiff disabled and entitled to SSI and DIB as of her alleged disability

onset date of April 1, 1997, until November 18, 2001, or, in the alternative, remanded for

another hearing limited to the issue of whether Plaintiff is entitled to benefits beginning

on an earlier onset date. Doc. 15 at 15.

In the first issue, Plaintiff argues that the ALJ erred in not finding Plaintiff disabled

prior to November 19, 2001, having violated the treating physician rule. Doc. 15 at 4.

Plaintiff lists what she characterizes as numerous impairments existing prior to June 30,

1998, her date last insured. Doc. 15 at 5-6. The ALJ found that Plaintiff has several

severe impairments most of which are common to Plaintiff's list such as

> a chronic pain syndrome secondary to osteoarthritis, osteoporosis, systemic
> lupus erythematosus, possible fibromyalgia, and depression. She is status-post
> surgical repair of enterocele and cystorectocele causing stress urinary
> incontinence, chronic obstructive pulmonary disease secondary to a history of
> tobacco abuse, depression, and hypercholesterolemia. Her impairments are
> considered severe within the meaning of the Regulations; but not severe enough
> to meet or medically equal any of the impairments listed in Appendix 1 to Subpart
> P of Regulations No.4.

R. 581-82. Plaintiff then argues that there is ample evidence of Plaintiff's disability prior

to June 30, 1998, based on the diagnoses of "various treating physicians" of the above-

listed impairments.  Doc. 15 at 6.  (Plaintiff does not argue that the "severe impairments" found by the ALJ meet or equal one or more Listing.  *Id.*  The ALJ found that the impairments were severe, but not severe enough to meet or equal any of the impairments listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  *Id.* at 581-82.  In the prior appeal, Judge Jenkins found that "the ALJ properly considered the combined effect of Plaintiff's impairments" and further found that Plaintiff's argument was without merit.  *Id.* at 601-02.).

Plaintiff then discusses selected findings from several treating physicians beginning with Dr. McIlwain, a rheumatologist, in 1993-1994.  Doc. 15 at 6-7; R. 314-17.  Patient notes from Dr. Clement, a rheumatologist, from 1996-1997, *id.* at 172-211, and Dr. Rozboril, rheumatologist, from September-October 1997, *id.* at 246-50, are discussed.  Doc. 15 at 7-8.  Each physician notes Plaintiff's pain and swelling with elaboration.

Plaintiff next discusses the treatment provided by Dr. McCarthy, another rheumatologist.  Doc. 15 at 8-9.  Dr. McCarthy's opinions have been and are a feature of this case.  In the prior appeal, the case was reversed and remanded because the prior ALJ erred "in discounting Dr. McCarthy's opinion based on" the ALJ's observation that Dr. McCarthy's assessment [in October 1998] was provided *after* Plaintiff's insured status expired on June 30, 1998, and Dr. McCarthy had not imposed any work restrictions on Plaintiff prior to that date.  R. 600.  Judge Jenkins concluded that "[t]hese factors do not show that Dr. McCarthy's opinion is unsupported by medical evidence, conclusory, or contrary to the evidence."  *Id.*

**2. Relevant Medical Evidence**

Plaintiff began treatment with Dr. McCarthy on or about June 10, 1997.  R. 229-

245, 419.[3]  Plaintiff was referred for a variety of rheumatologic problems including the

possibility of a recent diagnosis of lupus.  *Id.* at 232.  Plaintiff had been told of rheumatic

arthritis in the past and also fibrositis and now presented with a concern regarding

developing lupus.  Plaintiff's anti-nuclear antibody (ANA) is now positive; she has

arthritis "'all over' with swelling in the knees, wrists, increasing lower lumbar spine and

sacroiliac pain currently"; and increasing difficulty with her hand and wrist.  *Id.*

Dr. McCarthy noted that Plaintiff's rheumatologic review of systems is negative

although there is morning and evening stiffness.  A physical examination revealed, in

part, that Plaintiff was "in no apparent distress."  *Id.* at 233.  Other tests, e.g., HEENT,

neck, chest, abdomen, extremities, neurological, adenopathy, and peripheral pulse were

normal.  *Id.*  Regarding peripheral joints, Plaintiff had slight pain without significant

warmth and without swelling of the wrists; somewhat limited flexion and extension of the

lumbar spine; some tenderness over each sacroiliac area and minimal synovial

hypertrophy about each knee but without warmth or erythema.  *Id.*  Dr. McCarthy's initial

impressions included a recent diagnosis of SLE (lupus); history of rheumatoid arthritis

(RA), history of fibrositis per patient history; depression; history of positive IPPD with

negative chest x-ray; and idiopathic hypothyroidism.  *Id.* at 234.

---

[3]  The ALJ begins his discussion of Plaintiff's medical history with her August 25,
1993, examination by William E. Layden, M.D.; an April 29, 1994, examination by Harris
H. McIlwain, M.D.; and a July 2, 1994, consultative psychological examination by Arthur
H. Hamlin, Psy.D.  *Id.* at 574.  The ALJ noted the lack of medical records covering the
alleged onset date of April 1, 1997, and then discusses diagnostic test results beginning
in April 1998 and medical examinations by Sandra G. Gompf, M.D. in July and August
1998 and Michael C. Burnette, M.D. in June 1998.  *Id.* at 575.

On June 19, 1997, Dr. McCarthy reported the results of Plaintiff's laboratory studies that included generally normal and acceptable readings. *Id.* at 230. The rheumatoid factor was negative although the antinuclear antibody (ANA) was positive, "but with a very minimal reading of 1:160. The other antinuclear antibody subfractions returned with acceptable readings." *Id.* Films of the hands revealed arthritic changes on each side, most compatible with osteoarthritis; films of the cervical spine revealed no significant irregularities; films of the lumbar spine were normal, while the films of the sacroiliac joints returned with normal limits. *Id.* 230-31. A bone scan indicated perhaps an old injury to Plaintiff's posterior right ribs and aside from films indicating arthritic changes in her hands, the films were otherwise negative. *Id.* at 231.

Plaintiff was examined by Dr. McCarthy on July 17, 1997. Impressions were similar to prior impressions and included lupus; hypercholesterolemia; edema; hypothyroidism-Hashimoto's thyroiditis; osteoporosis; tobacco abuse; depression; fibrositis; and rheumatoid factor was currently negative. *Id.* at 229.

On August 15, 1997, although the signature is not legible, it appears that Dr. McCarthy completed a form for the Florida Department of Labor and Employment Security. *Id.* at 228. The information was used to evaluate Plaintiff's disability claim. *Id.* Dr. McCarthy advised that Plaintiff's range of motion for her back was 130 degrees on a scale of 0 to130; normal gait; hand-held assistance device was not necessary for ambulation; no atrophy, sensory loss, or abnormalities of the hands bilateral were noted; Plaintiff could perform basic grasping bilateral; and grip strength was at 5 on a scale of 5. Dr. McCarthy concluded with the statement that Plaintiff had generalized

myalgias and tender muscles associated with fibromyalgia. *Id.* (The ALJ does not

discuss Dr. McCarthy's treatment of Plaintiff in 1997. *Id.* at 574-81.)

As stated in endnote 3, *supra*, after discussing several examinations and test

results in 1993 and 1994, the ALJ then states that "[t]here are no medical records

covering the alleged onset date of disability of April 1, 1997." *Id.* at 575. There are

medical records pre and post-dating April 1, 1997, some of which are discussed above

from Dr. McCarthy and the ALJ does not discuss these records, although he discusses

later records from Dr. McCarthy from October 6 and 16, 1998, May 6, 1999, September

6, 2000, July 23, 2002, December 27, 2002, April 28, 2003, and August 29, 2003. *Id.* at

575-78.

In her Memorandum, Plaintiff refers to records from Dr. Clement from 1996-1997,

*id.* at 172-211; records from Dr. Beams in 1997, *id.* at 212-19; the consultative exam by

Dr. MacGregor in 1997, *id.* at 220-27; records from Dr. McCarthy in 1997, *id.* at 228-45;

records from Dr. Rozboril in 1997; and records from the Watson Clinic in 1997-1998, *id.*

at 246-50. Plaintiff does not discuss these records in any detail, however, or suggest

that the ALJ erred in not expressly referring to these records. Doc. 15 at 11.[4]

---

[4] Plaintiff refers to the July 1994 records of Arthur H. Hamlin, Psy.D., who
performed a psychological examination of the Plaintiff on July 2, 1994, for the Florida
Department of Labor and Employment Security. Doc. 15 at 9-10; R. 318-23. The ALJ
stated: "Based on his findings, he diagnosed [Plaintiff's] condition as major depression,
recurrent, moderate, and assigned a global assessment of functioning [GAF] of 50." *Id.*
at 574, 322. (Dr. Hamlin also stated that Plaintiff's highest GAF for the past year was
60. *Id.* at 322.) Plaintiff provides some more information from the examination including
a brief reference to Dr. Hamlin's assessment that Plaintiff's "medical status has
prevented her from returning to work and it remains highly questionable whether she will
be employable in the near future. She has not felt a diminution [sic] of pain through
medical treatments as of this date and the emotional overlay (financial and marital
stress) has most likely exacerbated the frequency and intensity of her pain experience.
She now feels a loss of control over the pain and her life." *Id.* at 323.

At this point in his decision, the ALJ discusses radiographs of Plaintiff's hands and knees performed on April 14, 1998, that showed no erosive changes at that time and that laboratory studies of April 13, 1998, were negative for the RA factor, but positive for ANA. *Id.* at 575.

On July 21, 1998, Plaintiff presented to Dr. McCarthy and reported being very fatigued. *Id.* at 426. Dr. McCarthy noted weakness, fatigue, and lethargy along with increasing arthralgias in the hips and knees and reported a concern that the Thyroid dose may need to be higher and diffuse arthralgias in general have developed. *Id.* Normal review of systems is noted. Surprisingly in light of the time of day, some tenderness in the MCPs, PIPs and wrists is noted with warmth in these areas. *Id.* Impressions are similar.

On July 27, 1998, Dr. McCarthy reported generally normal blood chemistry results; bone mineral density studies revealed osteoporosis at the 3rd and 4th lumbar vertebral bodies in the lumbar spine and diffuse, but less severe calcium loss termed osteopenia noted throughout the left hip. *Id.* at 324, 427. Dr. McCarty advised Plaintiff that aggressive therapy was indicated as she had been on previously. *Id.* at 324.

On August 18, 1998, Plaintiff presented to Dr. McCarthy complaining of increasing pain in the neck, shoulders, back, leg, hip, and feet. *Id.* at 423. A systems review was negative and no changes were noted for cardiopulmonary and abdominal exams as well as a joint exam. *Id.* Several medications were prescribed, although Dr. McCarthy declined to prescribe drugs for nerves and anxiety with management of these problems deferred back to Dr. Gompf. *Id.* Past similar impressions were noted. *Id.*

On September 18, 1998, Plaintiff returned to Dr. McCarthy who resisted Plaintiff's "multiple pleadings to give her tranquilizers and medications for migraines and anti-depressants and she states that she does not have the $30 which is required from the co-pay to see a psychiatrist. Apparently, Dr. Gomph [sic] has declined to manage the patient's psychiatric condition as well which is certainly understandable in that the patient has seen a psychiatrist previously. Advised the patient to nonetheless, call her psychiatrist by phone and see what can be arranged." A follow-up was scheduled for three months. *Id.* at 422.[5]

On October 6, 1998, Dr. McCarthy filled-out a form indicating that Plaintiff had been his patient since June 7, 1997, and had a most recent examination on September 18, 1998. *Id.* at 421. Symptoms included multiple joint pain. His diagnosis is systemic lupus erythematosus based upon laboratory and diagnostic testing and clinical findings which have included X-rays, laboratory studies including serology (ANA positive 1:160)

---

[5] The ALJ referred to patient notes from Sandra G. Gompf, M.D., of July 10, 1998, and August 18, 1998, *id.* at 335, 347-49, 575. (On June 16, 1998, Dr. Gompf assessed Plaintiff as actively suicidal/severe depression and further noted: "The patient will be transported on a voluntary basis for inpatient admission to a psychiatric facility as soon as possible today." *Id.* at 337. As noted by the ALJ, on August 18, 1998, Dr. Gompf completed as mental residual functional capacity assessment finding no evidence of limitation in 13 of 20 categories; made no rating in 5 areas; found Plaintiff *mildly* limited in her ability to accept instructions and respond appropriately to criticism from supervisors; and *moderately* limited in her ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 347-49, 575.) Plaintiff refers to a June 17, 1998 consultative exam from Joel B. Fried, Ph.D. Doc. 15 at 10; R. 272-75. This exam was performed at the request of the Florida Department of Labor and Employment Security. *Id.* Dr. Fried recommended that Plaintiff get back into mental health treatment on an individual out-patient basis; that she have a psychiatric evaluation for any additional medication needs; and that she continue to receive ongoing medical follow along and continue to take prescribed medications. Dr. Fried's impression was major depression, recurrent. *Id.* at 275. Plaintiff also refers to handwritten notes (that are difficult to read) of Dr. Jeffrey Beams who saw Plaintiff from approximately April 8, 1997 to June 12, 1997. *Id.* at 212-19; Doc. 15 at 10.

with moderate possible anti-ss-A with treatment.  Treatment was noted.  Dr. McCarthy

opined that Plaintiff cannot return to former employment and is unable to perform other

full-time work because of several limitations, including active systemic lupus

erythematosus, possible seronegative rheumatoid disease, osteoarthritis, and

depression.  He further noted that Plaintiff's condition is expected to last for at least

another one to two years.  *Id.*  (This is the first time ALJ Holder mentions in his decision

any medical input from Dr. McCarthy.  *Id.* at 575.)

On October 16, 1998, as recounted by Dr. McCarthy, Charles E. Binder

(apparently a law firm, *id.* at 420) requested Dr. McCarthy to opine when Plaintiff was

diagnosed with systemic lupus erythematosus (lupus) and the nature of the medical

evidence.  *Id.* at 419-20; *see id.* 575.  Dr. McCarthy stated:

> The patient was seen initially in this office 6/10/97, on referral from Doctor
> Forman at the Bond Clinic for concerns regarding her recent diagnosis of
> systemic lupus erythematosus.  Patient had a previous diagnosis of rheumatoid
> disease, but her diagnosis had recently changed to that of lupus.  She has a
> history of the antinuclear antibody being positive, alopecia and arthritis along with
> muscle and joint pain were components of her illness.
>
> The patient's sedimentation rate was high normal at 20 her anti-nuclear
> antibody returned positive with a reading of 1:160.  This was felt to represent
> enough evidence to support the diagnosis of systemic lupus erythematosus.  The
> patient's Sjogren's anti-SS-A also returned positive at 66 (moderately positive
> reading 40-80).

*Id.* at 419.  The ALJ discussed the October 6, 1998, form and the October 16, 1998,

opinion.  *Id.* at 575.  Without citing to a specific record page, Plaintiff refers to

Dr. McCarthy's October 6, 1998, form/report, but not to Dr. McCarthy's October 16,

1998, opinion letter.  Doc. 15 at 8-9.

The ALJ, but not Plaintiff, refers to several other patient notes from Dr. McCarthy covering 1999 through 2003. *Id.* at 576-78.[6] On May 6, 1999, Dr. McCarthy wrote an update-letter to the Bender law firm regarding Plaintiff's condition and restrictions. *Id.* at 408; *see id.* at 576 for the ALJ's discussion of this letter. Dr. McCarthy advises that Plaintiff's condition had not improved. *Id.* at 408. She continued on medication for lupus "although other observers may choose to differ on the basis of her ANA of 1:160 and anti-DNA which returned within normal limits and anti-SS-A returning moderately positive at 66." *Id.* Dr. McCarthy continues:

> The patient has symptomology in terms of myalgias and arthralgias with a concomitant diagnosis of possible fibrositis and seronegative rheumatoid disease (overlap). She has documented osteoarthritis, osteoporosis, depression and hypercholesterolemia.
>
> The patient's condition is significant, but not serious in terms at this point being a condition that would be associated with a shortened lifespan. The patient does have symptomology with increased physical activity, so any activity involving heavy lifting or significant physical exertional activity should be avoided.

*Id.*

On September 5, 2000, Dr. McCarthy noted Plaintiff was taking no more than six Vicodin pills a day. Plaintiff had increasing back pain. Her legs occasionally were 'numb' and feet 'tingling' and had right shoulder pain. The impression included undifferentiated connective tissue disease (UCTD), osteoarthritis, osteoporosis,

---

[6] The record contains other patient notes from Dr. McCarthy from October 21, 1998, November 17, 1998, January 21, 1999, January 21, 1999, February 22, 1999, and April 21, 1999. *Id.* at 409-18. There are also notes from 2000 including January 19, 2000, May 8, 2000, and July 25, 2000; an August 18, 2000, letter to Plaintiff providing the results of an August 8, 2000, bone scan that was consistent with mild osteoarthritis in both shoulders and both sternoclavicular joints and vague increased activity seen in the posterior aspect of the right seventh rib, that was unchanged since the previous examination of June 12, 1997, probably post-traumatic. *Id.* at 387-88. Other notes include a September 18, 2001, letter to Plaintiff regarding recent lab studies. *Id.* at 383.

possible early RA, goiter with a reference to Dr. Lee's note, hypercholesterolemia, and other diagnoses in full details per the record. *Id.* at 386.

In addition to discussing Dr. McCarthy's observations, the ALJ reviewed patient notes from other physicians, including Jerald M. Zakem, M.D., a rheumatologist, who performed a disability examination of Plaintiff on December 7, 1998, *id.* at 330-334, 575; a May 24, 2000, examination that appeared brief based on the patient note by Christopher M. Berchelmann, M.D., *id* at 372, 576; an October 24, 2000, hospital admission note indicating treatment for bronchitis and shortness of breath with a reference that Plaintiff smoked one to two packs of cigarettes daily, *id.* at 353-54, 576; and a note of October 11, 2001, from Stephen M. Zweibach, M.D., referring to a surgical repair procedure, *id.* at 576.

The ALJ also refers to numerous laboratory studies other than those previously mentioned from June 28, 2000, *id.* at 398, 576; August 2000, *id.* at 387-88, 576; February 8, 2001, *id.* at 385, 576; August 27, 2001, *id.* at 374-75, 576; August 6, 2001, *id.* at 576; and September 2001, *id.* at 384, 576.

Progressing further, the ALJ discusses the February 4, 2002, patient notes from Edward Lubin, M.D., Ph.D. who saw Plaintiff for fibromyalgia. *Id.* at 452-54, 577.

On July 23, 2002, as noted by the ALJ, *id.* at 577, Dr. McCarthy wrote a "to whom it may concern" letter and stated that Plaintiff had been in his office on July 16, 2002, relating to multiple medical problems including a significant pain condition treated by him and more particularly by Dr. Lubin. *Id.* at 467, 577. Several diagnoses are listed: fibromyalgia/fibrositis, myofascial pain syndrome; osteoarthritis, including degenerative disc disease-cervical and lumbar spine; undifferentiated connective tissue

disease (UCTD); menopause-ERT-discussion regarding having patient switch to Evista or defer to her gynecologist; hypercholesterolemia; and goiter. *Id.* at 467, 577. Dr. McCarthy concludes by stating: "It is our considered opinion that the patient is disabled at this time. It has been suggested that the patient have a functional capacity evaluation and this should be performed by a physical therapist who is an expert in the field of physical therapy and rehabilitation." *Id.* at 467.

On December 27, 2002, Dr. McCarthy treated Plaintiff for resolving bronchopneumonia. *Id.* at 577, 746; *see id.* at 747-50 (other patient notes from Dr. McCarthy (and one note from Dr. Lee) for October through December 2002). There are also patient notes from Dr. McCarthy and others from approximately February 8, 2003, through December 29, 2003. *Id.* at 731-45. The ALJ stated that Dr. McCarthy noted that Plaintiff requested Methadone on February 28, 2003, but he declined. *Id.* 577, 743. Plaintiff appeared for a follow-up visit with Dr. McCarthy on April 28, 2003, and as noted by the ALJ, after noting his review of Plaintiff's systems, Dr. McCarthy stated: "The patient seems somewhat out of control as compared to our exam findings." *Id.* at 577, 741. The ALJ further stated: "Laboratory findings of April 28, 2003 revealed evidence of mildly elevated cholesterol at 217, a slightly elevated sedimentation rate of 23, and a slightly reduced rheumatoid arthritis factor at less than 20 IU/ML. Two days later, claimant complained of snoring but had no shortness of breath and did not need an inhaler. The impression was chronic sinusitis and asthmatic bronchitis. On August 29, 2003, Dr. McCarthy noted difficulty correlating the patient's physical exam findings and objective findings to her symptoms (exhibit B3F, pp. 4,6[,] 7 and Exhibit B-7F, pp. 15-16)." *Id.* at 577-78, 738, 740, 921-22.

The ALJ discusses other diagnostic tests, examinations by treating physicians, and consultative examinations and reviews from May 2003, through January 2006. *Id*. at 578-81.

### 3. The ALJ's Analysis of the Medical Evidence

Having reviewed the medical evidence discussed in his decision, as described above, albeit not all of the medical evidence in the record, the ALJ determined that Plaintiff had several severe impairments, but none were severe enough to meet a Listing. *Id*. at 581-82. The ALJ recognized that when a determination of disability cannot be made based on the medical considerations alone, a decision must be made concerning the residual functional capacity which a claimant, here Plaintiff, retains. *Id*. at 582.

The ALJ "considered the entire case record, including the objective medical evidence, the claimant's statements, and other information and opinions provided by the treating and examining physicians pertaining to the claimant's symptoms and related functional affects. Her statements with respect to the effect on her ability to work have been considered under the provisions of Social Security Ruling 96-7p." *Id*. The ALJ set forth the factors he considered, *see* 20 C.F.R §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii), recognizing "that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone." *Id*. at 582.

> Applying these factors to the evidence herein, it is clear the claimant's allegations of debilitating physical limitations are exaggerated in light of the objective medical evidence as well as the activities of daily living that she reported. Nonetheless, the undersigned finds that the combined effect of the claimant's impairments precludes her from exertional work activities involving listing more than 10 pounds. However, the evidence is not persuasive that she

encounters any significant limitations with regard to sitting, standing, or walking. Thus, she retained the residual functional capacity to perform sedentary exertional work activities.

*Id.* at 523-83.[7]

Plaintiff described her past job as a corrections officer as requiring lifting and carrying of less than ten pounds. The Dictionary of Occupational Titles assesses this job "as requiring medium exertional work activities." *Id.* at 583. As noted by the ALJ "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting and carrying of objects weighing up to 25 pounds (20 CFR 404.1567(c) [20 C.F.R. § 416.967(c)]." *Id.* at 583. The ALJ found that Plaintiff's residual functional capacity has been reduced as a consequence of impairments such that she cannot be expected to perform her past relevant work as a corrections officer." *Id.*

The ALJ reached two conclusions.

First, Plaintiff was 41 years of age, a younger individual, as of her date of application on April 28, 1997, but 54 years of age at the time of the decision, "'considered closely approaching advanced age.' Considering her age, her high school education, and her reduced residual functional capacity limited to sedentary exertional work activities, the Medical-Vocational Rules [the Grids] 201.21 and 201.22 [applicable to "younger individual age 45-49] direct a finding of 'not disabled.'" *Id.* at 583.[8]

---

[7] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." S*ee* 20 C.F.R §§ 404.1567(a), 416.967(a).

[8] In Finding 9, the ALJ made the same ultimate finding, but referred to rules, 201.27-201.29 that apply to a "younger individual age 18-44." R. 584.

Second, the ALJ then considered a later onset date, November 19, 2001, after

Plaintiff attained the age of 50 on November 18, 2001, and applied Medical-Vocational

Rules 201.12 and 201.14 that apply to persons of "closely approaching advanced age"

(ages 50 to 54) to support the conclusion that Plaintiff is disabled as of November 19,

2001.[9]

Thus, the ALJ found that Plaintiff was *eligible* for disability payments under Title

XVI of the Social Security Act beginning November 19, 2001, as result of the application

of the Grids, but he *denied* her claim for disability payments under Title II of the social

Security Act because her last insured status date was June 30, 1998, which pre-dated

the date of disability, November 19, 2001, under the Grids.  *Id.* at 583.

### 4. Plaintiff's Argument

Plaintiff refers to several impairments such as rheumatoid arthritis, fibromyalgia,

and systemic lupus erythematosus, which Plaintiff suggests were found by various

treating physicians, and then argues that any one or combination of these impairments

"is ample evidence of Plaintiff BRANNON'S disability prior to June 30, 1998."  Doc. 15

at 6.  Plaintiff then sets forth some of the medical evidence, doc. 15 at 6-11, refers to

Eleventh Circuit precedent, and then implies that the ALJ erred in not following the

treating physician rule.  Doc. 15 at 4-13.

The Commissioner responds discussing, in part, patient notes from Dr. McCarthy

and others from 1997 through 1999, which support the ALJ's finding that Plaintiff was

---

[9]  Individuals in this age group "may be significantly limited in vocational adaptability if they are restricted to sedentary work.  When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferrable skills, a finding of disabled ordinarily obtains."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(g).

not disabled prior to June 30, 1998. The Commissioner argues that the ALJ properly rejected Dr. McCarthy's October 6, 1998, opinions that Plaintiff was unable to perform full-time work because of her multiple ailments and also that her condition was expected to last for at least another one to two years. Doc. 21 at 4-8; R. 421, 575.

The Commissioner correctly argues that Dr. McCarthy's ultimate opinion that Plaintiff is unable to work is an opinion on the issue of disability, which is specifically reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1)-(3), 416.927(d)(1)-(3). Curiously though, the Commissioner then states that "Dr. McCarthy's opinion is from October 6, 1998 (Tr. 421, 575), which is more than three months after her June 30, 1998 date last insured (Tr. 573), and, therefore, does little to prove her case." Doc. 21 at 6. This was part of the same reasoning offered to sustain the ALJ's decision in the first initial appeal, but rejected by Judge Jenkins. R. 599-600.

Notwithstanding, the Commissioner argues that Dr. McCarthy's opinion is inconsistent with the medical evidence from the relevant time period and ultimately concludes that the ALJ properly rejected Dr. McCarthy's October 1998 opinion based on the ALJ's findings. Doc. 21 at 6-8. Also, the Commissioner cites to record medical evidence that supports the ALJ decision, but not evidence that detracts from the ALJ decision or evidence that supports the opinion of Dr. McCarthy and others. Doc. 21 at 6-8.

The Commissioner's analysis assumes that the ALJ expressly rejected Dr. McCarthy's October 6, 1998, opinion, which he did not. The ALJ states that he "considered the entire case record, including the objective medical evidence, the claimant's statements, and other information and opinions by the treating and examining

physicians pertaining to the claimant's symptoms and related functional affects." *Id.* at

582. The ALJ did not expressly provide a rationale for his apparent rejection of

Dr. McCarthy's opinion(s) or other treating physicians' opinions, contrary to the remand

directive of Judge Jenkins.

Naturally, Plaintiff approaches the case from the opposite view and references

favorable medical evidence, but without discussion of the evidence that supports the

ALJ's decision and not much analysis as to why the ALJ erred. Doc. 15 at 4-13.

This case has a rather tortured history winding its way through the agency review

and hearing processes, then to the Appeals Council, and then judicial review, only to

return again for the processes to begin and end again, culminating in this round of

judicial review. Unfortunately, it is not yet over.

Based on the foregoing, the ALJ erred in not adequately explaining what appears

to be his implicit rejection of the opinions of Plaintiff's treating physicians, including but

not limited to the opinions of Dr. McCarthy. *See generally* Romanzi v. Comm'r of Soc.

Sec., Case No. 6:07cv1848-Orl-DAB, 2009 U.S. Dist. LEXIS 78, *14 (M.D. Fla. Jan. 5,

2009) ("it is not the task of the Court to re-weigh the evidence"), *appeal after remand*,

Romanzi v. Comm'r of Soc. Sec., Case No. 6:10cv484-ORL-DAB, 2011 U.S. Dist.

LEXIS 98661 (M.D. Fla. Aug. 31, 2011).[10] In light of the lengthy journey of this case,

the Commissioner is encouraged to expedite consideration of this case on remand. No

opinion is reached on the merits of Plaintiff's claim for additional benefits.

---

[10] Given the disposition of this case, it is unnecessary to consider Plaintiff's
second point.

**IV. Conclusion**

Considering the Record as a whole, the ALJ failed to adequately explain his reasons for what appears to be his implicit rejection of the opinions of Plaintiff's treating physicians, including Dr. McCarthy, and, as a result, the findings of the ALJ are not based upon substantial evidence in the record and the ALJ incorrectly applied the law. Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **REVERSED** and this case is **REMANDED** for further proceedings consistent with this Memorandum Opinion and Order. The Clerk is **DIRECTED** to enter judgment for Plaintiff.

**DONE AND ORDERED** at Tallahassee, Florida, on December 19, 2012.

s/    Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**